C. A. PYE, SR., v. ATLANTIC COMPANY, a CORPORATION.

(Filed 28 April, 1943.)

**Master and Servant § 65—**

In an action by plaintiff to recover from defendant wages and damages, under the Federal Fair Labor Standards Act of 1938, where plaintiff's evidence, in the most favorable light to him, showed that he was in the management of a recognized department of defendant's establishment, that he customarily and regularly directed the work of others employed therein, whom he hired and fired and exercised substantial discretionary powers, without sufficient evidence that his manual and clerical duties exceeded 20 per cent of his work week hours, such services bring plaintiff within the exemptive provisions of sec. 13, as the term "employed in a *bona fide* executive capacity" is defined by administrative regulation, and he is not entitled to recover.

APPEAL by plaintiff from *Blackstock, Special Judge,* at 19 October, 1942, Extra Civil Term, of MECKLENBURG. Affirmed.

The defendant is a corporation engaged in the manufacture, sale and distribution of beer and ale, with resident home office in Atlanta, Ga., and maintaining a branch office in Charlotte, N. C., from which it ships its products to its branches in North Carolina, South Carolina and Georgia, in barrels and crates by truck. It also does some local business by delivery immediately from the platform of the Charlotte building.

The plaintiff was for three years prior to 6 March, 1942, employed by defendant in the distribution of its products. He now brings action

under the Fair Labor Standards Act of 1938, 52 Stat., 1060, sec. 7 (a), 29 U. S. C. A., secs. 201-219—referred to as the Wages and Hours Law— to recover overtime wages for work done for the defendant beyond the schedule of maximum hours fixed in the Act, and for a like amount of liquidated damages for failure and refusal to pay overtime wages.

The defendant contends that during all this period the plaintiff was under the exemption provided in section 13 (a) (1) as a *"bona fide* executive," and not covered by the Act.

We summarize the evidence pertinent to these contentions:

The plaintiff testified that the bottling, loading and shipping was all carried on in one large room, in one corner of which was the bottling machinery and in the back a storage space filled up with beer or ale, or advertising matter, or anything to be shipped out of the place. At first plaintiff had a shelf on one side of the room on which he made and kept his records; but later a little enclosure was made for his comfort and convenience in the same room. The brewing department was separated from it by a partition. The bottling was carried on in the room in which plaintiff stayed.

The plaintiff supervised the loading and unloading of beer and ale, directing the quantity and kind to be put on each truck, inspected bottles and crates to see if broken bottles had been removed by employees, and that crates were in shape to carry the bottles, and that these were properly labeled and assorted as to color. During the loading he, for the most part, operated the conveyer controls. The actual loading was done sometimes by defendant's employees and sometimes by employees of the truck company which, under contract, hauled away the products. It was plaintiff's duty to keep a record of the beer and ale shipped away and empty crates and bottles returned, and make a form report thereof to the manager.

The defendant had a considerable local "platform" trade from the plant, and on occasions during the day plaintiff, rather than interrupt employees from their routine tasks, carried out crates and delivered them to customers. On occasions, the plaintiff had swept and mopped the floors—"all of us would put in there and take the 'squeejee' and broom" and start mopping up.

The plaintiff handled and distributed the advertising matter for the company and kept a record of materials, such as glue and caustic, received and used. He estimated that about 25% or 30% of his time was spent in manual labor and the rest in clerical duties. Including his 12-hour shifts on weekdays and a 3-hour shift on Sundays, he testified that he worked 75 hours per week.

Plaintiff further testified that there was no special supervision over the shipping department except from the Manager's office "except my

looking after the routine work they gave me to do"; that he had the checking and handling of all the merchandise that came to or went out of the plant; that he had under his supervision one Negro part of the time, and part of the time as many as two. There were at times as many as three or four—at one time twelve working on eight-hour shifts. Plaintiff gave instructions in the shipping department. They worked under him. There would be an average of eight or nine men working under plaintiff, but not all at one time. Plaintiff worked a crew and a half, and another man a crew and a half. "When I did not have laborers enough in the shipping department to do the work that was piled up on me, if I could pick up an extra man for four or five hours or half a day, I would do so and cut the time off of a later date on some man that I did not need on that day, since I was instructed not to allow my pay roll to go beyond a certain number of days a week. I hired men in my department, and as to firing men in my department, I have fired them." Plaintiff testified that he issued vouchers for the men temporarily hired by him during the three-year period.

Plaintiff made a list for the bottling department of what was needed to fill his orders, made from orders on his file. He testified that he was in charge of the shipping department, whether it consisted of "one or two men, whatever there were."

Plaintiff, according to general instructions, used his judgment whether in certain cases of urgent calls or in case of shortage of products, which orders should be filled in preference to others, and the quantity to be shipped to certain customers. He had instructions to fill telephone or telegraph orders first, and to fill long haul-orders ahead of short-haul orders, which he did.

In connection with hiring and firing men, plaintiff testified as follows:

"When I first came to this job there were some Negroes working there in connection with the shipping. After a year or so, one or two of them were fired. The manager fired one, I think, and I think I fired one. I have consulted with the manager in connection with hiring or firing employees. If a man had been there a year or so, I had some hesitancy in letting him go without mentioning it to the manager and I always consulted him when necessary about letting what we considered an "old" man go, who had been working there a long time, and as a rule he would tell me what he thought best. I have talked with the manager about hiring men to work in the shipping department and he would say, 'Well, that's up to you. You can use your own judgment about his work and see how it is, and if he is all right, it's all right with me.' The manager himself would hire and fire Negroes in connection with the shipping."

Plaintiff was corroborated as to the character of his services by A. H. Leonard, a former employee of the defendant.

Upon this evidence, the court below took the view that the plaintiff was an executive within the meaning of that term in the exempting provisions of section 13, as defined by the Administrator; and upon motion of the defendant on the conclusion of all the evidence, rendered judgment as of nonsuit, from which the plaintiff appealed.

*Frank W. Orr and Frank H. Kennedy for plaintiff, appellant.*
*Stewart & Moore for defendant, appellee.*

SEAWELL, J. Sections 6 (a) and 7 (a) of the Fair Standards of Labor Act provide a schedule of minimum wages and maximum hours for those employed in interstate commerce. There is no question that plaintiff was so employed or that his evidence as to overtime work was sufficient to go to the jury. But defendant insists that under plaintiff's own evidence, he should be regarded as employed in a *"bona fide* executive capacity" within the exemptive features of section 13, and therefore not entitled to overtime wages.

Section 13 authorizes the Administrator to define and delimit the terms used in the exemption clause, and acting under that authority, he issued regulations (October, 1940) defining the term "employee employed in a *bona fide* executive capacity" as follows:

"The term 'employee employed in a *bona fide* executive capacity' in section 13 (a) (1) of the Act shall mean any employee

"(A) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

"(B) who customarily and regularly directs the work of other employees therein, and

"(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

"(D) who customarily and regularly exercises discretionary powers, and

"(E) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

"(F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed twenty per cent of the number of hours worked in the workweek by the nonexempt employees under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment."

PYE *v.* ATLANTIC CO.

Our attention is called to the fact that paragraph (E) of this definition has been held invalid by some Federal District Courts whose decisions are cited in the brief; but the paragraph is inapplicable here since the plaintiff received more wages per week than the minimum—$30— fixed in the definition.

Upon careful examination we have come to the conclusion that the plaintiff's evidence, taken in the light most favorable to him, sufficiently shows that he was in the management of a recognized department of the defendant's establishment, that he customarily and regularly directed the work of others employed therein, that he had and exercised the authority to hire and fire other employees in that department, and in the performance of these duties and others customarily and regularly exercised substantial discretionary powers.

The proportion of time spent by plaintiff in what he designates as manual and clerical duties are conclusions of the witness. We have no means of determining what time was spent in nonexempt employment, because the duty of supervision and management of his department— and the performance of that duty—appear to have been unbroken, except where, as a matter of convenience, plaintiff assisted in some work which was regularly in the routine of other employees. The clerical work alone, according to the evidence, was not sufficient to take him out of the definition of the Administrator as a percentage of performance of nonexempt services.

Perhaps we might have some concepts of a more expansive nature as to what an "executive" is or ought to be—of degree and importance, since we have come to associate that term with "big business" and worthwhile compensation. If the Administrator, official definer and delimiter of the term, had similar views, he failed to capture them within the web of his thesis. He has taken the more practical view that the definition and classification must be put on a functional basis, related to the business in which the employee is engaged, and the service he performs, which would make the importance of his position relative to the business in which he is employed.

Valid definitions within the delegated power speak with authority, and become the dictionary of the law.

We are led to the conclusion that the nature of plaintiff's services, as disclosed in his evidence, brings him within the exemptive provisions of S. 13, as its terms are officially defined by administrative regulation, and that he is not entitled to recover.

The judgment of nonsuit is
Affirmed.